**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PLANNED PARENTHOOD
FEDERATION OF AMERICA, INC.;
PLANNED PARENTHOOD GOLDEN
GATE,
         *Plaintiffs-Appellees,*

    v.

ALBERTO R. GONZALES, Attorney
General of the United States, in
his official capacity,
         *Defendant-Appellant,*

    v.

CITY AND COUNTY OF SAN
FRANCISCO,
         *Plaintiff-intervenor-*
         *Appellee.*

No. 04-16621

D.C. No.
CV-03-04872-PJH

OPINION

Appeal from the United States District Court
for the Northern District of California
Phyllis J. Hamilton, District Judge, Presiding

Argued and Submitted
October 20, 2005—San Francisco, California

Filed January 31, 2006

Before: Stephen Reinhardt, Sidney R. Thomas, and
William A. Fletcher, Circuit Judges.

Opinion by Judge Reinhardt

1299

## COUNSEL

Peter D. Keisler, Kevin V. Ryan, Gregory G. Katsas (argued), Marleigh D. Dover, Catherine Y. Hancock, Teal Luthy Miller, Jeffrey A. Wadsworth, U.S. Department of Justice, Washington DC, for the defendant-appellant.

Eve C. Gartner (argued), Roger K. Evans, Mimi Liu, Planned Parenthood Federation of America, Inc., New York, New York; Helene Krasnoff, Planned Parenthood Federation of America, Inc., Washington DC; Beth H. Parker, Teresa Federer, Rachel Sommovilla, Bingham McCutchen LLP, San Francisco, California, for the plaintiffs-appellees.

Jay Alan Sekulow, Stuart J. Roth, Colby M. May, Walter M. Weber, American Center for Law and Justice, Washington D.C., for amici curiae American Center of Law and Justice and various members of Congress in support of defendant-appellant.

Steven W. Fitschen, The National Legal Foundation, Virginia Beach, Virginia, for amicus curiae The National Legal Foundation in support of defendant-appellant.

James Bopp, Jr., Thomas J. Marzen, Richard E. Coleson, Bopp, Coleson & Bostrom, Terre Haute, Indiana, for amicus curiae Horatio R. Storer Foundation, Inc. in support of defendant-appellant.

Julie Shotzbarger, Thomas More Law Center, Ann Arbor, Michigan, for amicus curiae Thomas More Law Center in support of defendant-appellant.

Teresa S. Collett, University of St. Thomas School of Law, Minneapolis, Minnesota, for amici curiae the Christian Medical and Dental Society and the Catholic Medical Association in support of defendant-appellant.

James Joseph Lynch Jr., Brad Dacus, James Griffiths, Pacific Justice Institute, Sacramento, California, for amici curiae Margie Riley and Laurette Elsburry in support of defendant-appellant.

Dennis J. Herrera, Joanne C. Hoeper, Aleeta Van Runkle, Kathleen S. Morris, Office of the City Attorney, San Francisco, California, for the plaintiff/intervenor-appellee.

Kurt G. Calia, Gregory M. Lipper, Kimberly S. McNish, Covington & Burling, Washington, DC; David M. Jolley, Covington & Burling, San Francisco, California; Margaret C. Crosby, American Civil Liberties Union Foundation of Northern California, Inc., San Francisco, California; Susan Friets-

che, Stacey I. Young, Women's Law Project, Pittsburgh, Pennsylvania; David S. Cohen, Women's Law Project, Philadelphia, Pennsylvania, for amici curiae the California Medical Association, Association of Reproductive Health Professionals, Physicians for Reproductive Choice and Health, and seventy-five individual physicians in support of plaintiffs-appellees.

## OPINION

REINHARDT, Circuit Judge:

This appeal presents a challenge to the constitutionality of the Partial-Birth Abortion Ban Act of 2003, Pub. L. No. 108-105, 117 Stat. 1201 (codified at 18 U.S.C. § 1531). We, like every other federal court that has considered the question, conclude that both the Constitution and the law as established by the Supreme Court require us to hold the Act unconstitutional. Unlike the other courts, however, we do so after fully considering the Supreme Court's recent decision in *Ayotte v. Planned Parenthood of N. New England*, No. 04-1144 (U.S. Jan. 18, 2006). In light of *Ayotte*, we conclude that the only appropriate remedy is to enjoin enforcement of the Act and we now affirm the district court's grant of a permanent injunction.

## I.  Background

### A.  *Post-First Trimester Abortion Methods*

The vast majority of abortions in the United States are performed during the first trimester.[1] Approximately ten percent

---

[1] The first trimester lasts until the thirteenth or fourteenth week of pregnancy, measured from the woman's last menstrual period ("lmp"). *Planned Parenthood Fed'n of Am. v. Ashcroft*, 320 F. Supp. 2d 957, 960

of abortions are performed during the second trimester. Only about one percent are performed after the twentieth week from the woman's last menstrual period ("lmp") and only a small portion of those after the twenty-fourth week, the earliest time at which viability begins. In short, only a tiny percentage of abortions are performed after viability may have commenced.

Women seek abortions after the first trimester for various reasons, including newly discovered fetal anomalies and maternal health problems that are created or exacerbated by the pregnancy. This is primarily because ultrasound and amniocentesis — procedures that often detect these medical conditions — generally are not available until the second trimester. Because abortions are rarely performed after the twenty-fourth week lmp and even more rarely after the second trimester (in both cases almost always for medical reasons), the Act essentially regulates previability second trimester abortions.

Nearly all post-first trimester abortions are performed using one of two methods: dilation and evacuation ("D&E") or induction.[2] D&E accounts for 85 to 95 percent of such abortions.

(N.D. Cal. 2004); *see also Stenberg v. Carhart,* 530 U.S. 914, 923 (2000) (measuring the first trimester at twelve weeks gestational age, which equals fourteen weeks lmp after adding the approximately two weeks between menstruation and conception). The second trimester lasts until approximately the twenty-seventh week lmp (twenty-four weeks gestational age), with the third culminating in birth (typically at forty weeks lmp). *Planned Parenthood*, 320 F. Supp. 2d at 960. A fetus is generally understood to have achieved viability—meaning that there exists a realistic potential for long-term survival outside the uterus—at twenty-four weeks lmp or later. *Id.*

[2]Two additional methods are available but are used exceedingly rarely, usually only in an emergency: hysterotomy, which resembles a caesarean delivery through the abdomen; and hysterectomy, which involves complete removal of the woman's uterus with the fetus inside. *Stenberg*, 530 U.S. at 987 n.7.

Unlike induction, which is a form of "medical" abortion, D&E is a surgical procedure involving two steps: dilation of the cervix and surgical removal (evacuation) of the fetus. There are two forms of D&E, intact and non-intact.[3]

The first step of the procedure, cervical dilation, is the same for both forms of D&E. It is achieved primarily through the use of osmotic dilators, which are sponge-like devices that expand the cervix, typically over a period of twenty-four to forty-eight hours. Some doctors also use medications known as prostaglandins in conjunction with the osmotic dilators, though these drugs sometimes induce labor spontaneously, which results in partial or complete expulsion. The dilation process is necessary so that the doctor may insert an instrument, generally a type of forceps, through the cervix and into the uterus in order to remove the fetus.

The second step of the procedure, the evacuation phase, is when the two forms of D&E become different.[4] When performing a non-intact D&E, the doctor, under ultrasound guid-

---

[3]Some doctors reject the characterization of intact and non-intact D&E as two separate forms of the D&E procedure. Rather, they believe that there is only a single form which is sometimes performed in a manner that differs from other implementations, but in a way that is of no medical consequence.

Other doctors choose not to label the intact and non-intact procedures as forms of D&E for a different linguistic reason. These doctors reserve the term D&E for the non-intact procedure and call intact removals "dilation and extractions" ("D&X"). D&X is the nomenclature used in *Stenberg*. 530 U.S. at 927.

The labeling of the procedure is of no consequence to our analysis; however, for simplicity's sake we prefer intact and non-intact D&E. What is relevant, however, is that one could substitute D&X for intact D&E wherever the latter term appears in our opinion and nothing would change in any respect.

[4]In either form of D&E, the removal procedure usually lasts ten to fifteen minutes, during which the woman receives either conscious sedation or general anesthesia.

ance, grasps a fetal extremity with forceps and attempts to bring the fetus through the cervix. At this point, the fetus will ordinarily disarticulate, or break apart, because of traction from the cervix, and the doctor must return the instrument to make multiple passes into the uterus to remove the remaining parts of the fetus, causing further disarticulation. To complete the removal process, the doctor evacuates the placenta and any remaining material using a suction tube, or cannula, and a spoon-like instrument called a curette.

In an intact D&E, the doctor, rather than using multiple passes of the forceps to disarticulate and remove the fetus, removes the fetus in one pass, without any disarticulation occurring (i.e., the fetus is "intact"). An intact D&E proceeds in one of two ways, depending on the position of the fetus in the uterus. If the fetus presents head first (a vertex presentation), the doctor first collapses the head, either by compressing the skull with forceps or by inserting surgical scissors into the base of the skull and draining its contents. The doctor then uses forceps to grasp the fetus and extracts it through the cervix.[5] If the fetus presents feet first (a breech presentation), the doctor begins by grasping a lower extremity and pulling it through the cervix, at which point the head typically becomes lodged in the cervix. When that occurs, the doctor can either collapse the head and then remove the fetus or continue pulling to disarticulate at the neck. (If the doctor uses the latter option, he will have to use at least one more pass of the forceps to remove the part of the fetus that remains, and the procedure is not considered an intact D&E.)

As the district court found, some doctors prefer to use the intact form of D&E, whenever possible, because they believe it offers numerous safety advantages over non-intact D&E. As the district court also found, intact D&E may be significantly safer than other D&E procedures because it involves fewer

---

[5]In some cases, doctors will convert a fetus that presents head first into the breech position before beginning the evacuation.

instrument passes, a shorter operating time and consequently less bleeding and discomfort for the patient, less likelihood of retained fetal or placental parts that can cause infection or hemorrhage, and little or no risk of laceration from bony fetal parts. Finally, as the district court found, intact D&E is in fact the safest medical option for some women in some circumstances. For example, women with specific health conditions and women who are carrying fetuses with certain abnormalities benefit particularly from the availability of the intact D&E procedure.

According to the American College of Obstetricians and Gynecologists ("ACOG"), the safety advantages offered by intact D&E mean that in certain circumstances it "may be the best or most appropriate procedure . . . to save the life or preserve the health of a woman."[6] Doctors typically decide whether to attempt an intact D&E based primarily on the amount of cervical dilation, but they can never predict beforehand whether they will be able ultimately to remove the fetus intact. In most cases, intact D&E is not an option from the outset; in others, although the procedure may start out as an intact removal, during the course of the procedure it turns into a non-intact D&E.

As explained further below, the government construes the Act as prohibiting intact D&Es but permitting non-intact

---

[6]The primary alternative to the D&E procedures is induction, which comprises approximately 5 percent of abortions performed between weeks fourteen and twenty and 15 percent of abortions performed after the twentieth week. Many doctors consider inductions less safe than D&Es. When employing this procedure, the doctor starts an IV and uses a prostaglandin suppository (or a saline injection) to induce uterine contractions and labor. The entire process takes between eight and seventy-two hours, with most inductions concluding within twenty-four hours. Some inductions will not completely expel the fetus, requiring the doctor to perform a D&E to finish the procedure. Although a D&E may be performed in an outpatient setting, a woman choosing to undergo induction must be admitted to a hospital.

D&Es, whereas the plaintiffs assert that it covers both forms of the procedure, as well as induction. The plaintiffs also contend that even if the Act banned only intact D&Es, it would still be unconstitutional.

## B.   The Statute

Enacted in response to the Supreme Court's decision in *Stenberg v. Carhart*, 530 U.S. 914 (2000), which declared a Nebraska statute regulating "partial-birth abortions" unconstitutional, the Act subjects any physician who "knowingly performs a partial-birth abortion" to civil and criminal penalties, including up to two years of incarceration. 18 U.S.C. § 1531(a) (2005).[7] The Act's definition of "partial-birth abortion" covers an abortion performed by any doctor who:

(A) deliberately and intentionally vaginally delivers a living fetus until, in the case of a head-first presentation, the entire fetal head is outside the body of the mother, or, in the case of breech presentation, any part of the fetal trunk past the navel is outside the body of the mother, for the purpose of performing an overt act that the person knows will kill the partially delivered living fetus; and

(B) performs the overt act, other than completion of delivery, that kills the partially delivered living fetus.

18 U.S.C. § 1531(b)(1). Doctors who perform a "partial-birth abortion" are exempt from criminal liability only when the

---

[7]Before passing the Act at issue here, Congress passed two similar bans, in 1996 and 1998, but President Clinton vetoed both of them and Congress did not override those vetoes. *See* 142 CONG. REC. H3338 (daily ed. Apr. 15, 1996); 144 CONG. REC. S10564 (daily ed. Sept. 18, 1998). In support of the earlier legislation and the Act at issue here, Congress held sporadic hearings on the issue of "partial-birth abortion," and received a number of statements of policy from individuals and organizations that it included in the Congressional Record.

procedure is "necessary to save the life of a mother whose life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself." 18 U.S.C. § 1531(a). The Act does not contain an exception for abortions that are necessary to preserve the health of the woman.

Congress made several findings of fact in support of its determination that the Act's prohibition did not require a health exception. Partial-Birth Abortion Ban Act § 2(8)-(13). Most significant, Congress found that:

> There exists substantial record evidence upon which Congress has reached its conclusion that *a ban on partial-birth abortion is not required to contain a 'health' exception, because the facts indicate that a partial-birth abortion is never necessary to preserve the health of a woman*, poses serious risks to a woman's health, and lies outside the standard of medical care.

*Id*. at § 2(13) (emphasis added). Another of Congress's central findings was that a "moral, medical and ethical consensus" exists that intact D&E is "never medically necessary and should be prohibited." *Id*. at § 2(1).[8]

## C. The Litigation

Directly after President George W. Bush signed the Act into law on November 5, 2003, the plaintiffs filed this lawsuit claiming that the Act violates rights guaranteed by the U.S.

---

[8]Congress also declared that courts must afford great deference to its findings, under the Supreme Court's holdings in *Turner Broadcasting System, Inc. v. FCC* ("*Turner II*"), 520 U.S. 180 (1997), and related cases. Partial-Birth Abortion Ban Act §2(8)-(12). The level of deference that must be applied to Congress's findings is discussed *infra* in Section III.A.

Constitution. The City and County of San Francisco intervened as a plaintiff. On November 6, 2003, the district court issued a temporary injunction against enforcement of the Act.[9] At the government's request, the district court consolidated the preliminary injunction hearing and the trial on the merits. After an approximately three-week trial in which it heard the testimony of thirteen expert witnesses, the district court found the Act unconstitutional and entered a permanent injunction against its enforcement. *Planned Parenthood Fed'n of Am. v. Ashcroft*, 320 F. Supp. 2d 957, 1034-35 (N.D. Cal. 2004).

The district court's holding rested on its determination that the Act violated the Constitution in three respects. First, the district court found the Act unconstitutional because it imposed an undue burden on a woman's right to choose to terminate her pregnancy before viability. The court concluded that the Act's definition of "partial-birth abortion" reached all D&E procedures as well as certain induction abortions. Because D&E and induction procedures comprise nearly all post-first trimester abortions, the district court concluded that the Act created a risk of criminal liability for virtually all abortions performed after the first trimester, which, the district court found, placed a substantial obstacle in the path of abortion-seekers. In the alternative, the court found that the Act created an undue burden even if construed to apply only to intact D&Es. It found that the failure to distinguish between previability and postviability abortions placed a substantial obstacle in the path of women who seek or require an intact D&E prior to viability, even under the unconvincing alternate construction of the statute.

Second, the district court found the Act unconstitutionally vague. The court reasoned that the term "partial-birth abor-

---

[9]In two similar lawsuits, injunctions were also obtained from federal district courts in New York and Nebraska. *See Nat'l Abortion Fed'n* ("*NAF*") *v. Ashcroft*, 330 F. Supp. 2d 436, 442 (S.D.N.Y. 2004); *Carhart v. Ashcroft*, 287 F. Supp. 2d 1015, 1016 (D. Neb. 2003).

tion" was not recognized in the medical community, and the phrases "living fetus," "deliberately and intentionally," and "overt act" failed to put physicians on notice as to what procedures would violate the statute. As a result, the district court found that the Act deprived physicians of fair notice and encouraged arbitrary enforcement. The district court held that the inclusion of scienter requirements did not remedy the vagueness.

Third, the district court found the Act unconstitutional because it failed to include a health exception. The court held that as a preliminary matter, it need not decide the highly disputed issue of the proper standard of deference applicable to Congress's findings because, even under the most deferential standard of review, Congress's finding that the prohibited procedures were never medically necessary to preserve women's health was not entitled to controlling deference. Instead, the court, on the basis of the record before Congress at the time it passed the Act, the record before the district court and Supreme Court in *Stenberg*, and the record adduced by the parties in the present case, concluded that the Act's failure to include a health exception rendered it unconstitutional.

## D.   *Other Federal Courts' Treatment of the Act*

In addition to the district court, three other federal courts have reviewed the Act and each has held it unconstitutional. The Eighth Circuit declared the Act unconstitutional because it failed to contain an exception for women's health as required under *Stenberg*. *Carhart v. Gonzales*, 413 F.3d 791, 803-04 (8th Cir. 2005).[10] The district court in that case also found the Act unconstitutional because of the lack of a health exception, as well as because it imposed an undue burden on

---

[10]Because it found the Act unconstitutional on the ground that it lacked a health exception, the Eighth Circuit declined to reach the statute's other potential constitutional infirmities. *Carhart*, 413 F.3d at 803-04.

a woman's ability to choose a previability, post-first trimester abortion. *Carhart v. Ashcroft*, 331 F. Supp. 2d 805, 809 (D. Neb. 2004).[11] Finally, the District Court for the Southern District of New York found the Act unconstitutional because it did not contain a health exception. *Nat'l Abortion Fed'n.* ("*NAF*") *v. Ashcroft*, 330 F. Supp. 2d 436, 492-493 (S.D.N.Y. 2004).[12] None of these courts considered separately the question of remedy because under *Stenberg,* 530 U.S. at 946, enjoining enforcement of the Act appeared to be mandatory at the time the decisions were issued. *Ayotte*, slip op. at 9.

## II.   Standard of Review

We review an order granting a permanent injunction for abuse of discretion or application of erroneous legal principles, *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1079 (9th Cir. 2004), but review determinations underlying such a grant by the standard that applies to such determinations. *Ting v. AT&T*, 319 F.3d 1126, 1134-35 (9th Cir. 2003). As a result, underlying legal rulings are reviewed *de novo* and underlying factual findings are reviewed under the clearly erroneous standard. *Id*. The question whether the Act imposes an undue burden or is unconstitutionally vague is a legal issue subject to *de novo* review. *Planned Parenthood of S. Ariz. v. Lawall* ("*Lawall II*"), 307 F.3d 783, 786 (9th Cir. 2002).

In analyzing a facial challenge to an abortion statute, we apply the undue burden standard established in *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 895

---

[11]In addition, the Nebraska district court noted that the law would be unconstitutionally vague if the government's " 'specific intent' construction" of the statute was not valid. Although the court accepted the government's construction, the judge stated, "I would not be surprised if I was reversed on this point. If I have erred by accepting [the government's] construction, and that is a close question, then the statute is obviously far too vague." *Carhart*, 331 F. Supp. 2d at 1040.

[12]The *NAF* court also declined to reach the other grounds for declaring the statute unconstitutional. *NAF*, 330 F. Supp. 2d at 482-83.

(1992). *Lawall II*, 307 F.3d at 786. "[T]he fact that the statute is susceptible to *some* constitutional application will not save it from facial attack. Rather, we must be satisfied that it will pose an undue burden in only a small fraction of relevant cases." *Planned Parenthood of Idaho Inc. v. Wasden*, 376 F.3d 908, 921 (9th Cir. 2004); *see also Richmond Med. Ctr. for Women v. Hicks*, 409 F.3d 619, 627-28 (4th Cir. 2005) (noting the recent Supreme Court case *Sabri v. United States*, 541 U.S. 600 (2004), makes clear that the "no set of circumstances" test for facial challenges from *United States v. Salerno*, 481 U.S. 739 (1987), "does not apply in the context of a facial challenge, like the one here, to a statute regulating a woman's access to abortion"). When the question concerns the existence of an adequate health exception, "facial challenges may prevail in an even broader group of cases: those where a law could preclude an abortion where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Wasden*, 376 F.3d at 921 n.10 (citing *Stenberg*, 530 U.S. at 930) (internal quotation marks omitted); *see also Carhart*, 413 F.3d at 795 ("[I]f the Act fails the *Stenberg* test, it must be held facially unconstitutional."); *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 196 (6th Cir. 1997) ("[A] post-viability abortion regulation which threatens the life or health of even a few pregnant women should be deemed unconstitutional."), *quoted in Planned Parenthood of Rocky Mountain Serv. v. Owens*, 287 F.3d 910, 919 (10th Cir. 2002).

When determining the remedy for a statute found to be unconstitutional, we are guided by "three interrelated principles": one, we try to invalidate no more of a statute than is necessary to remedy the constitutional violation; two, we are mindful that the limited judicial role and our institutional competence prevent us from rewriting a statute in order to make it constitutional; and three, any remedy we devise must be faithful to the legislative intent in enacting the statute. *Ayotte*, slip op. at 6-10.

**III.   Analysis**

We hold that the Act is unconstitutional for three distinct reasons, each of which is sufficient to justify the district court's holding. First, the Act lacks the constitutionally required health exception. Second, it imposes an undue burden on women's ability to obtain previability abortions. Third, it is unconstitutionally vague, depriving physicians of fair notice of what it prohibits and encouraging arbitrary enforcement. For reasons explained in Section IV *infra*, we conclude that the appropriate remedy is to enjoin the enforcement of the Act. We therefore affirm the district court's issuance of the permanent injunction.

*A.   The Act Is Unconstitutional Because It Lacks Any Exception to Preserve the Health of the Mother*

We hold that the omission of a health exception from the Act renders it unconstitutional. In reaching that conclusion, we first determine whether and in what circumstances a statute that regulates abortion but lacks a health exception is constitutional under *Stenberg*. Next, we consider the proper standard of review for the findings Congress made in support of its omission of a health exception from the Act. Finally, in light of this analysis, we assess the Act and the congressional findings that bear on its constitutionality.

*i.   The Standard for Evaluating Abortion Restrictions that Lack a Health Exception*

**[1]** Our analysis of whether the Act's lack of a health exception renders it unconstitutional is controlled by *Stenberg* and *Casey*. *Stenberg* reaffirms *Casey*'s holding that the Constitution requires that any abortion regulation must contain such an exception if the use of the otherwise regulated procedure may in some instances be necessary to preserve a woman's life *or health*. *Wasden*, 376 F.3d at 922; *see also Hicks*, 409 F.3d at 625. *Stenberg* holds that an abortion regu-

lation that fails to contain a health exception is unconstitutional except when there is a medical consensus that no circumstance exists in which the procedure would be necessary to preserve a woman's health. 530 U.S. at 937. By medical consensus, we do not mean unanimity or that no single doctor disagrees, but rather that there is no significant disagreement within the medical community.

The *Stenberg* holding implements the health exception requirement announced in *Casey*. *Casey* held that even when the state's interest in regulating abortion is at its height (i.e., postviability), any restriction of an abortion method must include an exception when that method " 'is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother' " in some circumstances. *Stenberg*, 530 U.S. at 921 (quoting *Casey*, 505 U.S. at 879 (quoting *Roe v. Wade*, 410 U.S. 113, 164-65 (1973))). The Supreme Court noted that the phrase "necessary, in appropriate medical judgment" does not require "absolute necessity," "absolute proof," or "unanimity of medical opinion" regarding the need for the use of the regulated procedure to preserve women's health in some instances. *Stenberg*, 530 U.S. at 937. In fact, the Court emphasized that, for purposes of *Casey*'s requirement that an abortion ban have a health exception, "division of medical opinion . . . signals the presence of risk, not its absence," and thus compels the inclusion of the exception in the statute. *Id*. Because "uncertainty" or division in the medical community regarding the need for a health exception "means a significant likelihood that those who believe that [a particular type of abortion procedure] is a safer abortion method in certain circumstances [than the alternatives] may turn out to be right," the Court held that as long as there is a lack of consensus in that community, any regulation of an abortion method must contain a health exception. *Id*. at 937-38. Without a medical consensus, the Court stated, it is impossible for a legislative body to determine that "a health exception is never necessary to preserve the health of women" and, in such circumstance, any abortion regulation the legislature enacts without a health

exception is unconstitutional. *Id.* (internal quotation marks omitted); *see also Carhart*, 413 F.3d at 796 ("[W]e believe when a lack of consensus exists in the medical community, the Constitution requires legislatures to err on the side of protecting women's health by including a health exception."). Under the constitutional rule established in *Stenberg*, therefore, we must inquire whether — applying the appropriate degree of deference to the legislative body's findings — the legislature properly concluded that there is *consensus in the medical community* that the banned procedure is never medically necessary to preserve the health of women. *See NAF*, 330 F. Supp. 2d at 488.[13]

*ii.  Identifying  and  Applying  the  Appropriate  Level  of Deference to Congress's Factual Findings in the Act*

Having identified the inquiry we must undertake in order to assess the constitutionality of the Act's lack of a health exception, we now turn to the level of deference we must apply to the relevant congressional findings. Here, Congress omitted a health exception because it found that "the facts indicate that a partial-birth abortion is never necessary to preserve the

---

[13]The government's argument that the lack of medical consensus was "only one of four 'evidentiary circumstances' bearing on the question of comparative safety" and not the "dispositive constitutional standard" misconstrues the *Stenberg* opinion. A careful reading of *Stenberg* makes clear that the Court discusses the "evidentiary circumstances" in the context of *Casey*'s principle that an abortion restriction must contain a health exception when "necessary, in appropriate medical judgment, for the . . . health of the mother." As explained above, the requirement that a lack of medical consensus mandates the inclusion of a health exception is the direct manifestation of this principle. The "medically related evidentiary circumstances" are discussed by the Court in explaining its conclusion that there was a lack of medical consensus about the need for a health exception to the ban contained in the Nebraska statute and thus the statute was unconstitutional. The discussion of these "medically related evidentiary circumstances" does not establish or imply that "comparative safety," as determined by the legislative body, is the standard for assessing an abortion ban that lacks a health exception.

health of a woman," Partial-Birth Abortion Ban Act § 2(13), and that a "moral, medical and ethical consensus" exists that "partial-birth abortion" is "never medically necessary and should be prohibited." *Id.* at § 2(1). Under *Stenberg*, the former finding is dependent on the validity of the latter.

The government and many of the amici argue that Congress's findings of fact in this case should be evaluated under the standard articulated by the Court in *Turner Broadcasting System v. FCC* ("*Turner II*"), 520 U.S. 180 (1997), and related cases. Under this standard, when reviewing findings of fact that bear on the constitutionality of a statute, a reviewing court need only " 'assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence.' " *Id.* at 195 (quoting *Turner Broad. Sys. v. FCC* ("*Turner I*"), 512 U.S. 622, 666 (1994)). The Court has explained that when applying the substantial evidence standard, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent . . . [a] finding from being supported by substantial evidence." *Turner II*, 520 U.S. at 211 (internal quotation marks and citations omitted). The appellants and other amici, however, strongly argue that *Turner* does not apply to evaluations of the Act's constitutionality.

As an initial matter, we note that the Court's treatment of the level of deference to be applied to congressional findings that bear on the constitutionality of statutes has been less than clear. In some cases, the Court has expressly applied the substantial evidence standard described in *Turner* and related decisions. *See, e.g.*, *McConnell v. FEC*, 540 U.S. 93, 165 (2003). In others, the Court, without mentioning *Turner* or substantial evidence, and without identifying the standard of review it is applying, has reviewed congressional findings of fact with considerably less deference. *See, e.g., Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 368-72 (2001); *United States v. Morrison*, 529 U.S. 598, 609-13 (2000). Considered together, these cases make it difficult to identify the proper standard to be applied to congressional findings that

bear on the constitutionality of certain statutes; in fact, they suggest that no single standard exists.

Fortunately, we need not resolve the question of the proper standard of review for findings made pursuant to the Act. Under even the most deferential level of review, the one identified as applicable in Congress's findings and by the government in its arguments to this court, we cannot defer to the critical congressional finding in this case: that there is a consensus in the medical community that the prohibited procedures are never necessary to preserve the health of women choosing to terminate their pregnancies. The record before Congress clearly demonstrates that no such consensus exists, as do the congressional findings themselves. As a result, we cannot uphold the finding to the contrary, even if we apply substantial evidence review.

Although Congress found that "[a] moral, medical, and ethical consensus exists that the practice of performing a partial-birth abortion . . . is never medically necessary," Partial-Birth Abortion Ban Act § 2(1), that finding is directly belied by another of Congress's findings and by the record that Congress developed in support of the legislation. The evidence of the lack of medical consensus is replete throughout that record and is confirmed in a significant statutory finding. As the district court pointed out, "Congress'[s] very findings contradict its assertion that there is a consensus. Congress subsequently noted in its findings that 'a prominent medical association,' the AMA, concluded that '*there is no consensus* among obstetricians about' the use of intact D&E." *Planned Parenthood*, 320 F. Supp. 2d at 1025 (citing Partial-Birth Abortion Ban Act § 2(14)(C)) (emphasis added). The district court also noted that "Congress . . . had before it a joint statement from the AMA and ACOG, the two largest medical organizations taking positions on the issue, which recognized the disagreement among and within the two organizations." *Id*. at 1025. Furthermore, "nearly half (22 out of 46) of all individual physicians who expressed non-conclusory opinions

to Congress" stated that the banned procedures were necessary in at least some circumstances, as did professors of obstetrics and gynecology from many of the nation's leading medical schools. *Carhart*, 331 F. Supp. 2d at 1009; s*ee also Planned Parenthood*, 320 F. Supp. 2d at 1025-26 (describing other evidence before Congress demonstrating a lack of medical consensus).

**[2]** The evidence before Congress at the time it passed the Act, as well as other evidence presented during litigation, has led every court that has considered the statute's constitutionality to conclude that no medical consensus exists that the abortion procedures outlawed by the Act are never necessary to preserve the health of a woman — and we agree. *See Carhart*, 413 F.3d at 802 ("If one thing is clear from the record in this case, it is that no consensus exists in the medical community. The record is rife with disagreement on this point, just as in *Stenberg*."); *Carhart*, 331 F. Supp. 2d at 1008 ("In fact, there was no evident consensus in the record that Congress compiled. There was, however, a substantial body of medical opinion presented to Congress in opposition."); *id.* at 1009 ("Based upon its own record, it was unreasonable to find, as Congress did, that there was 'consensus' of medical opinion supporting the ban. Indeed, a properly respectful review of that record shows that a substantial body of contrary, responsible medical opinion was presented to Congress. A reasonable person could not conclude otherwise."); *NAF*, 330 F. Supp. 2d at 482 ("There is no consensus that [intact D&E] is never medically necessary, but there is a significant body of medical opinion that holds the contrary."); *Planned Parenthood*, 320 F. Supp. 2d at 1025 ("[T]he evidence available to Congress in passing the Act in 2003, and currently before this court, very clearly demonstrates . . . that there is no medical or ethical consensus regarding either the humanity, necessity, or safety of the procedure.").

The government all but admits in its reply brief that no medical consensus exists regarding the need for the prohibited

procedures to preserve the health of women in certain circumstances. *See* Appellant's Reply Brief at 25 (admitting that "both sides now concede the existence of 'contradictory evidence' in the congressional and trial records"). Nonetheless, it argues that the lack of consensus regarding whether the procedures prohibited by the Act are ever necessary to preserve the health of women is irrelevant because under *Turner* courts must resolve reasonable factual disagreements in favor of congressional findings. The flaw in the government's argument is not the standard of review it invokes, which may or may not be correct, but the factual dispute it identifies as relevant. In reviewing the Act's lack of a health exception, the dispositive question is not, as the government asserts, whether Congress's finding that the prohibited procedures are never necessary to preserve the health of a mother offers a reasonable (or plausible) resolution of a genuine factual dispute (which incidentally the record shows it does not). Rather, under *Stenberg*, it is whether there is general agreement in the medical community that there are no circumstances in which the procedure would be necessary to preserve a woman's health.

Even the most cursory review of the Act and the congressional record developed in support of it reveals that no such medical consensus exists, a fact that the government essentially concedes in its brief to this court and that is fully confirmed by the evidence introduced in the district court during trial. Thus, whether we use *Turner*'s substantial evidence test or a more rigorous standard, under no circumstances would the record permit us to uphold a finding that meets the *Stenberg* requirement of the absence of a division of opinion in the medical community.

**[3]** We conclude that we cannot defer to Congress's finding that the procedures banned by the Act are never required to preserve the health of women; to the contrary, we are compelled to conclude, on the basis of the record before Congress, of the congressional findings themselves, and of evidence

introduced in the district court, that a substantial disagreement exists in the medical community regarding whether those procedures are necessary in certain circumstances for that purpose. In such circumstance, we are compelled to hold that a health exception is constitutionally required. We therefore affirm the district court's holding that Congress's failure to include a health exception in the statute renders the Act unconstitutional.[14]

*B.   The Act is Unconstitutional Because It Imposes an Undue Burden on Women's Right to Choose a Previability Abortion*

[4] In addition to its lack of a health exception, the Act suffers from other major deficiencies that lead us to conclude that it is unconstitutional, including the undue burden it imposes on a woman's constitutional right to choose to have an abortion before the fetus is viable.[15] The Constitution guarantees a woman the right to choose to terminate a previability pregnancy. *Stenberg,* 530 U.S. at 921 (quoting *Casey*, 505 U.S. at 870); *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 539 (9th Cir. 2004) (as amended); *Wasden*, 376 F.3d at 921. Although the Constitution firmly guarantees women that right, the state may seek to protect its interest in fetal life by regulating the means by which abortions may be secured, provided the regulations do not impose an "undue burden" on a woman's ability to obtain an abortion. *Stenberg*, 530 U.S. at

---

[14]Our conclusion applies whether the Act is construed as banning only intact D&Es or all D&Es. *See* section III.B *infra*. Whenever a procedure is banned that may be necessary to preserve *some* women's health, a statutory exception is required. *Stenberg*, 530 U.S. at 934-38.

[15]The question of the constitutionality of statutes that regulate "partial-birth abortions" is of substantial importance and requires as prompt an answer as possible. Rather than relying solely on one ground and reserving the other questions as to the statute's constitutionality for later adjudication, we deem it best to decide simultaneously all constitutional issues raised. Moreover, whether a remedy other than enjoining enforcement of the Act in its entirety is appropriate may depend in part on the nature and extent of the constitutional violations. *See Ayotte*, slip op. at 7.

921; *Casey*, 505 U.S. at 874; *see also Tucson Woman's Clinic*, 379 F.3d at 539; *Wasden*, 376 F.3d at 921. An " 'undue burden is . . . shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.' " *Stenberg*, 530 U.S. at 921 (quoting *Casey*, 505 U.S. at 877).

[5] In *Stenberg*, the Court held that a Nebraska statute regulating so-called "partial-birth abortions" imposed an undue burden. Without deciding the issue whether a statute that outlawed only intact D&Es would be unduly burdensome, the *Stenberg* court held that an abortion ban that failed to differentiate in its statutory language between intact D&Es and non-intact D&Es unquestionably constituted an undue burden, for the obvious reason that it would prohibit most second trimester abortions. *Stenberg*, 530 U.S. at 938-46. As part of its analysis, the *Stenberg* Court provided legislatures with guidance about how to draft statutes that would adequately distinguish between the two forms of D&E. The Court explained that a legislature can make clear that a statute intended to regulate only intact D&Es applies to that form of the procedure only, by using language that "track[s] the medical differences between" intact and non-intact D&Es or by providing an express exception for the performance of non-intact D&Es and other abortion procedures. *Stenberg*, 530 U.S. at 939.[16] In

---

[16]As an example, the Court cited Kansas's "partial-birth abortion" ban which explicitly exempts the "dilation and evacuation abortion procedure involving dismemberment of the fetus prior to removal from the body of the pregnant woman." Kan. Stat. Ann. § 65-6721(b)(2) (Supp. 1999), *cited in Stenberg*, 530 U.S. at 939. The Ohio "partial-birth abortion" ban recently upheld by the Sixth Circuit also specifically exempts non-intact D&Es in its statutory language. *See Women's Med. Prof'l Corp. v. Taft*, 353 F.3d 436, 452 (6th Cir. 2003) (upholding Ohio Rev. Code Ann. § 2919.151 (Anderson 2002)); *see also Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 140 (3rd Cir. 2000) (declaring New Jersey's "partial-birth abortion" ban unconstitutional and stating that "[i]f the Legislature intended to ban only the [intact D&E] procedure, it could easily have manifested that intent either by specifically naming that procedure or by setting forth the medical definition of [intact D&E] utilized by the ACOG").

her concurring opinion, Justice O'Connor emphasized how by employing the latter approach, a legislature could easily make clear that a statute intended to regulate intact D&E was in fact narrowly tailored to reach only that form of the D&E procedure. *Stenberg*, 530 U.S. at 950 (O'Connor, J., concurring). Citing three state statutes prohibiting intact D&Es which had "specifically exclud[ed] from their coverage" other abortion methods,[17] Justice O'Connor described the language each statute used, providing legislatures wishing to prohibit only intact D&Es with a clear roadmap for how to avoid the problems regarding the scope of coverage that undid the Nebraska statute. *Id.*

When drafting the Act, however, Congress deliberately chose not to follow the Court's guidance. *See* Section IV *infra.* The Act's definition of the prohibited procedures does not attempt to track the medical differences between intact D&E and other forms of D&E, nor does it explicitly exclude non-intact D&Es from its reach. Instead of using either of these approaches for accomplishing the objective the government embraces in its brief — prohibiting only intact D&Es, Congress defined the prohibited procedure in a way that a number of doctors have explained includes both intact and non-intact D&Es, and that we likewise conclude bans both forms of the procedure. Because the Act, like the statute invalided in *Stenberg*, would allow prosecutors to pursue physicians who "use [non-intact] D&E procedures, the most commonly used method for performing previability second trimester abortions" and would cause all doctors performing those procedures to "fear prosecution, conviction, and imprisonment," *Stenberg*, 530 U.S. at 945, it too is unconstitutional.[18]

---

[17]In addition to the Kansas statute referenced in the majority opinion, Justice O'Connor also cited laws enacted by Montana, Mont. Code Ann. § 50-20-401(3)(c)(ii) (Supp. 1999), and Utah, Utah Code Ann. § 76-7-310.5(1)(a) (1999). *Stenberg*, 530 U.S. at 950 (O'Connor, J., concurring).

[18]*Stenberg* held that a regulation that prohibits non-intact D&Es as well as intact D&Es imposes an undue burden. *Stenberg*, 530 U.S. at 938. Because the prohibition here applies to both, we need not reach the issue whether the Act also applies to induction procedures. Nor need we decide whether if the Act applied only to intact D&Es, it would on that basis alone unduly burden the rights of women.

Neither the differences the government cites between the language of the Act and the Nebraska statute nor the scienter requirements contained in the Act limit its application to the intact D&E procedure and neither, therefore, serves to cure the statute's constitutional infirmity.

### i.   The Act Encompasses Non-Intact D&E Procedures

The government offers no explanation for why Congress did not adopt either of the two approaches outlined by the Court and Justice O'Connor in *Stenberg* for legislating a prohibition that is applicable only to the intact D&E procedure. Rather, it asserts that the federal statute differs from the Nebraska statute invalidated in *Stenberg* in three significant respects that collectively make it clear that the Act applies only to that form of the procedure. It argues that, as a result, the Act is constitutional although the Nebraska law was not. The differences in statutory language to which the government points fall far short, however, of adequately differentiating between the two forms of D&E, much less of achieving the degree of certainty regarding the Act's scope that Congress could have easily accomplished had it followed *Stenberg,* either by tracking the medical differences between intact D&E and other forms of D&E or by specifying that the forms of D&E other than the intact version are not covered by the prohibition.

The three differences between the Act and the Nebraska statute that the government relies on are as follows. First, the government notes that unlike the Nebraska statute which applied when the living fetus or a substantial portion of it was delivered "into the vagina," Neb. Rev. Stat. § 28-326(9), the federal Act applies only when there is a vaginal delivery "outside the body of the mother," 18 U.S.C. § 1531(b)(1)(A). The government argues that because non-intact D&E generally involves dismemberment of the fetus before it leaves the mother's body, the specification that the Act applies only when a living fetus or a part thereof is delivered outside the

mother's body makes clear that the Act does not apply to that procedure. The government's claim is incorrect. As the record demonstrates and the district court found, in non-intact D&Es, a doctor may extract a substantial portion of the fetus — including either a part of the fetal trunk past the navel or the entire fetal head — to the point where it is outside the body of the mother before the fetal disarticulation occurs. Although different from the provision in the Nebraska statute, the "outside the body of the mother" provision does not limit the Act's reach to intact D&Es and, as a result, does not eliminate the undue burden the Act imposes.

Second, the Nebraska statute applied only when "a living unborn child, or a substantial portion thereof" is delivered for the purpose of performing a prohibited act, Neb. Rev. Stat. § 28-326(9), whereas the federal Act states its prohibition applies only when either the "entire fetal head" or "any part of the fetal trunk past the navel" of a living fetus is delivered for a similar purpose, 18 U.S.C. § 1531(b)(1)(A). The government argues that the use of a "specific anatomic landmark" addresses the concern the Supreme Court expressed with the "substantial portion" language of the Nebraska statute.[19] As with the first difference relied upon by the government, however, the "specific anatomic landmark" language makes the Act different from the Nebraska statute but does not exclude non-intact D&Es from the Act's coverage. As the district court found, intact D&Es are not the only form of D&E in which the "entire fetal head" or "any part of the fetal trunk past the navel" of a living fetus may be delivered prior to the performance of an act banned by the statute: the "anatomic

---

[19]In *Stenberg*, the Court stated it did not understand how using the language of the Nebraska statute "one could distinguish . . . between [non-intact] D&E (where a foot or arm is drawn through the cervix) and [intact D&E] (where the body up to the head is drawn through the cervix). Evidence before the trial court makes clear that [non-intact] D&E will often involve a physician pulling a 'substantial portion' of a still living fetus, say, an arm or leg, into the vagina prior to the death of the fetus." 530 U.S. at 939.

landmark" specified in the Act may be reached by doctors performing either intact or non-intact D&Es.[20] Accordingly, this second difference from the Nebraska statute, like the first, does not establish that the Act is applicable only to intact D&Es.

Third, the Nebraska statute applied when a doctor "deliberately and intentionally deliver[s] into the vagina a living unborn child, or a substantial portion thereof, *for the purpose of performing a procedure that the person performing such procedure knows will kill the unborn child and does kill the unborn child*." Neb. Rev. Stat. § 28-326(9) (emphasis added). The federal statute, however, requires that a doctor "deliberately and intentionally vaginally deliver[ ] a living fetus . . . *for the purpose of performing an overt act that the person knows will kill the partially delivered living fetus*" and "*perform*[ ] *the overt act, other than completion of delivery, that kills the partially delivered living fetus*." 18 U.S.C. § 1531(b)(1)(A), (B). The government argues that this "overt act" requirement unambiguously establishes that the Act does not apply to abortion procedures other than intact D&Es. However, this language is also not as restrictive as the government claims. In non-intact D&Es, as well as in the intact form of the procedure, if the fetus has been brought to either of the two anatomic landmarks specified in the Act, a doctor may then, in order to complete the abortion safely, need to perform an "overt act," other than completing delivery, that the physician knows the fetus cannot survive, if it is still liv-

---

[20]In a non-intact D&E, the presence of "some part of the fetal trunk past the navel . . . outside the body of the mother" can occur, for instance, when "on an initial pass into the uterus with forceps, the physician disarticulates a small fetal part, which does not cause immediate demise, and then on a subsequent pass, the fetus is brought out of the cervix past the fetal navel" before further disarticulation occurs or when "on an initial pass into the uterus with forceps, the physician brings out a fetal part — either attached to the rest of the fetus, or not — that is 'part of the fetal trunk past the navel,' but the extraction does not cause immediate demise." *See Planned Parenthood*, 320 F. Supp. 2d at 972.

ing, and that "kills" the fetus. The "overt act" that may be performed in a non-intact D&E includes disarticulating the fetus or compressing the abdomen or other fetal part that is obstructing the completion of the uterine evacuation. As with the other two differences in the statutory language that the government claims clearly establish that the Act applies only to intact D&E, the "overt act" language does not so restrict the Act's applicability.

**[6]** Contrary to the government's claim, properly construed the Act covers non-intact as well as intact D&Es. As a result, despite containing some provisions that are different in form from those in the Nebraska statute, the Act is sufficiently broad to cause those who perform non-intact D&E procedures to "fear prosecution, conviction, and imprisonment." *Stenberg*, 530 U.S. at 945. The resulting chilling effect on doctors' willingness to perform previability post-first trimester abortions would impose an undue burden on the constitutional rights of women. *Id.*[21]

### ii.   The Act's Scienter Requirements Do Not Cure the Constitutional Infirmity

The government also argues that the Act's scienter requirements preclude application of the statute to physicians who perform non-intact D&E procedures and that the federal statute should therefore survive constitutional scrutiny. Although the Act does limit its reach to those who "*knowingly* perform a partial-birth abortion," 18 U.S.C. § 1531(a) (emphasis added), and "*deliberately and intentionally* vaginally deliver[ ] a living fetus until, in the case of a head-first presentation, the entire fetal head is outside the body of the mother, or, in the case of breech presentation, any part of the fetal

---

[21]We note that the Act's reference to "living fetus" does not differentiate it from the Nebraska statute, which used the same term. Nor does this or any other language in the Act limit its applicability to viable fetuses. *See infra* pages 1336-37.

trunk past the navel is outside the body of the mother," 18 U.S.C. § 1531(b)(1)(A) (emphasis added), these scienter requirements do not permit us to interpret the Act as reaching only the intact D&E procedure.

**[7]** The government's argument about the restrictive effect of the statute's scienter requirements depends on the premise that, once the scienter requirements are applied, the Act's description of the prohibited procedure includes only intact D&Es. However, that is simply not the case. The actions described in the statute's definition of the prohibited procedure can be performed with the requisite intent in both the intact and the non-intact forms of the D&E procedure. For instance, the record shows that a doctor performing a non-intact D&E of a fetus in the breech position may, in order to minimize the number of disarticulated fetal parts removed from the woman's body, "deliberately and intentionally vaginally deliver[ ] a living fetus until . . . the fetal trunk past the navel is outside the body of the mother" before performing the acts of disarticulation. Such an abortion meets all of the requirements of the procedure outlawed by the Act — the doctor knowingly, deliberately, and intentionally vaginally delivers the fetus to the specific anatomic landmark and does so for the purpose of performing an "overt act [the disarticulation] that [he] knows will kill the partially delivered living fetus" and performs that act. *See, e.g.*, Brief of Amici Curiae the California Medical Association et al. at 22.[22] Even with the Act's scienter requirements, therefore, non-intact D&Es readily fall within the scope of the statute's description of the banned procedure. As a result, the inclusion of the scienter requirements does not resolve the undue burden concerns recognized by the Supreme Court in *Stenberg*.

---

[22]Because the Act's definition reaches many non-intact D&E procedures even if "deliberately and intentionally" modifies not only the vaginal delivery language but also the language describing the other steps contained in the Act's definition of "partial-birth abortion," it is unnecessary to resolve the parties' dispute as to which parts of the procedure as defined by the Act the "deliberately and intentionally" requirement applies.

*iii. Conclusion*

**[8]** The Act's definition of the prohibited procedure, like that of the unconstitutional Nebraska statute, covers both forms of D&E, intact and non-intact. In any event, it fails to differentiate between the two sufficiently clearly to permit doctors to perform the latter procedure without fear of prosecution. Because the Act applies to, or could readily be employed to prosecute, physicians who "use [non-intact] D&E procedures, the most commonly used method for performing previability second trimester abortions," *Stenberg*, 530 U.S. at 945, it imposes a substantial risk of criminal liability on almost all doctors who perform previability abortions after the first trimester. Thus, the Act would, at a minimum, create a chilling effect that " 'plac[es] a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.' " *Id.* at 921.[23] We conclude that, because of both the actual and the potential risk to doctors who perform previability abortions, the Act imposes an "undue burden upon a woman's right to make an abortion decision," *id.* at 946, and is unconstitutional.

## C. The Act is Unconstitutionally Vague

Besides lacking the required health exception and imposing an undue burden on a woman's right to terminate her pregnancy, the Act is also unconstitutionally vague. It fails to define clearly the medical procedures it prohibits, depriving doctors of fair notice and encouraging arbitrary enforcement. The Act's scienter requirements do not cure the statute's vagueness. We conclude that the Act's unconstitutional vagueness constitutes an independent ground for affirming the district court's finding of unconstitutionality.

---

[23]We do not reach the question whether the Act would impose an undue burden if it clearly applied only to intact D&Es, although the question presents at the least a substantial constitutional issue.

**[9]** To survive vagueness review, a statute must "(1) define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited; and (2) establish standards to permit police to enforce the law in a non-arbitrary, non-discriminatory manner." *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 940 (9th Cir. 1997) (citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). The need to avoid vagueness is particularly acute when the statute imposes criminal penalties, *see Forbes v. Napolitano*, 236 F.3d 1009, 1011-12 (9th Cir. 2000) (as amended), or when it implicates constitutionally protected rights, *see Nunez by Nunez*, 114 F.3d at 940. Because this statute both imposes criminal penalties and implicates a constitutionally protected right, it is subject to heightened vagueness review. *Id*. The Act cannot survive that review.

**[10]** The government essentially makes three arguments regarding the vagueness of the Act. First, it asserts that the statutory scheme as a whole "specifically and narrowly defines" the single "method of abortion" that it outlaws (i.e., intact D&E). As we have explained, *Stenberg* explicitly described, for the benefit of legislative bodies (and, presumably, the government), two possible ways to make clear that a prohibition on intact D&E is applicable only to that form of the procedure. Congress deliberately declined to adopt either method and instead drafted statutory language that may best be understood as also outlawing non-intact D&Es, the type of procedure most often used to perform post-first trimester pre-viability abortions. This reading of the statute was confirmed by the trial testimony of numerous doctors and practitioners offering abortion services. As the district court noted, "they do not understand exactly what the Act prohibits." *Planned Parenthood*, 320 F. Supp. 2d at 977.[24] Although we may con-

---

[24]In citing the testimony of the doctors who testified at trial, the district court was not treating its vagueness determination as an "evidentiary question," as the government claims. Rather, it used that testimony to help it understand the steps involved in the different forms of D&E and induc-

clude following a painstaking legal analysis that the statute covers both forms of D&E, the language of the statute, taken as a whole, is not sufficiently clear regarding what it permits and prohibits to guide the conduct of those affected by it terms, specifically medical practitioners. As a result, the Act is unconstitutionally vague, and certainly so if the legislative intent was, as the government argues, to restrict its scope to intact D&E.

Second, the government objects to the district court's conclusion that the specific terms "partial-birth abortion," "overt act," and "living fetus" are "fatally ambiguous." As to the term "partial-birth abortion," the government challenges the district court's statement that the term has "little if any medical significance," arguing that it is " 'widely known' as synonymous with the medical terms 'D&X' and 'intact D&E.' " The only citation the government offers to support this argument is a Sixth Circuit case, *Women's Med. Prof'l Corp. v. Taft*, 353 F.3d 436, 439-40 (6th Cir. 2003), which considered an Ohio ban on "partial-birth abortion." *Taft*, however, does nothing to bolster the government's argument that the term "partial-birth abortion" is, in and of itself, sufficiently clear as to the procedures it encompasses that any vagueness problems with the statute are cured. In fact, the contrast between the Ohio statute reviewed in *Taft* and the federal Act at issue here illuminates the latter's vagueness. In *Taft*, the Sixth Circuit's conclusion that the Ohio statute survived vagueness review did not rest at all on the proposition that the term "partial-birth abortion" is " 'widely known' as synonymous with the medical terms 'D&X' and 'intact D&E.' " Rather, the Sixth Circuit held the Ohio law was not unconstitutionally vague

---

tion, in order to assess whether the Act's language was sufficiently clear, and, in the district judge's own words, to "confirm[ ]" its legal conclusion that the Act was vague. *Planned Parenthood*, 320 F. Supp. 2d at 977. This is an entirely appropriate use of expert testimony by a court as part of a vagueness inquiry.

because the statute defined the restricted procedures using "clinical terms" and explicitly stated that it did not apply to non-intact D&E or other abortion procedures besides intact D&E.[25] *Taft*, 353 F.3d at 441. The Sixth Circuit noted that by defining the reach of its statute's prohibition in this way, Ohio heeded the Supreme Court's observation in *Stenberg* that "Nebraska might have fared better if its description of the procedure had 'tracked the medical differences between [non-intact] D&E and [intact D&E],' [or] 'provided an exception for the performance of [non-intact] D&E and other abortion procedures.' " *Taft*, 353 F.3d at 452 (quoting *Stenberg*, 530 U.S. at 939). By contrast, Congress chose to ignore *Stenberg*'s warning when it enacted the Act, as noted in the previous section, and failed to follow its clear roadmap — either by defining the scope of the statute's prohibition using clinical terms that track the medical differences between intact D&E and other forms of D&E or by delineating expressly which procedures are exempted from the ban. The *Taft* decision, therefore, provides no support for the proposition that the term "partial-birth abortion" is concrete enough on its own to obviate any vagueness concerns with a statute that seeks to outlaw it. The government cites no other case, in this circuit or any other, that supports its proposition and thus has offered no justification for its claim that "partial-birth abortion," which is not a recognized medical term, is itself sufficiently clear to overcome the vagueness concerns identified by the district court.

**[11]** Alternatively, the government argues that "partial-birth abortion" is an "expressly defined term [in the statute] . . . and thus cannot itself support a vagueness challenge."

---

[25]As the *Taft* court reported, one provision of the Ohio statute provided, "This section does not prohibit the suction curettage procedure of abortion, the suction aspiration procedure of abortion, or the dilation and evacuation procedure of abortion." 353 F.3d at 452. Another part of the Ohio statute further clarifies the scope of its prohibition, stating " '[d]ilation and evacuation procedure of abortion' does not include the dilation and extraction procedure of abortion." *Id.*

However, the mere fact that "partial-birth abortion" is an "expressly defined term" in the statute is not enough to survive vagueness review if that definition is itself vague, as is the case here. *See, e.g., Planned Parenthood of Cent. N.J. v. Farmer,* 220 F.3d 127, 136-40 (3d Cir. 2000) (finding a New Jersey statute outlawing "partial-birth abortion" unconstitutional based on its conclusion that its definition of "partial-birth abortion" was vague). Although the federal Act uses somewhat different language from that used in the statute invalidated in *Stenberg*, its definition of "partial-birth abortion" nonetheless "fails to provide a reasonable opportunity to know what conduct is prohibited" and "is so indefinite as to allow arbitrary and discriminatory enforcement." *Tucson Woman's Clinic*, 379 F.3d at 554. The Act does not "specifically and narrowly define[ ]" a single "method of abortion," as the government claims; rather, its provisions could readily be applied to a range of methods of performing post-first trimester abortions. Furthermore, as discussed above, Congress chose not to take the simple steps, suggested by the Court in *Stenberg*, to cure the vagueness in its definition of partial-birth abortion. As a result, doctors who perform non-intact D&E abortions, which the government contends are not intended to be outlawed by the Act, have good reason to fear that they will be deemed subject to its prohibitions. At the least, they cannot be reasonably certain that their conduct is beyond the reach of the Act's criminal provisions; nor can they be reasonably assured that the Act will not be arbitrarily enforced.

[12] The government also objects to the district court's characterization of "overt act" as vague. It asserts that the term itself is not unconstitutionally vague, citing its use in the Constitution and various federal statutes. It further claims that by modifying "overt act" with the phrase "other than completion of delivery," the statute makes clear that the term does not apply to "cutting the umbilical cord" or other "essential aspects of delivery," which, it argues, establishes that the statute's ban does not encompass induction. While the govern-

ment rightly points out that the term "overt act" is not in all usages unconstitutionally vague, the district court was correct to hold that in the context of the Act it is, even when modified by "other than completion of delivery." Beyond conclusory statements, the government in no way refutes the district court's determination that "overt act, other than completion of delivery" can plausibly encompass a range of acts involved in non-intact D&E, including disarticulation and compressing or decompressing the skull or abdomen or other fetal part that is obstructing completion of the uterine evacuation (and in induction, possibly even the cutting of the umbilical cord). Because these acts can readily be deemed covered by the phrase "overt act, other than completion of delivery," the phrase does not provide the definitiveness about the statute's scope that the government asserts. The use of the term "overt act" does nothing to remedy the statute's failure to provide adequate notice of what forms of D&E the Act prohibits and to prevent its arbitrary enforcement. *See Forbes*, 236 F.3d at 1011.

[13] The government additionally challenges the district court's conclusion that the term "living fetus" contributes to the vagueness of the statute. We, like the Third Circuit, conclude that the use of "living fetus" in a statute banning "partial-birth abortions" adds to confusion about the scope of the prohibited conduct. Although the term "living fetus" may suggest to some that the Act's prohibition is limited to abortions of viable fetuses, the term has no such meaning. While a fetus typically is not viable until at least 24 weeks lmp, it can be "living" — meaning that it has a detectable heartbeat or pulsating umbilical cord — as early as seven weeks lmp, well before the end of even the first trimester. As the Third Circuit noted, "because a fetus may be 'living' as early as seven weeks lmp, use of the term 'living' instead of 'viable' indicates that, contrary to the understanding of a large segment of the public and the concomitant rhetoric, the Act is in no way limited to late-term, or even mid-term, abortions. . . . [M]ost common abortion procedures will fall within this limi-

tation." *Farmer*, 220 F.3d at 137. Therefore, far from curing the statute's vagueness problems, the use of the term "living fetus" instead of "viable fetus" creates additional confusion about the Act's scope.

**[14]** Third, the government argues that any unconstitutional vagueness is eliminated by the "narrowing and mutually reinforcing scienter requirements." However, as we explained in the undue burden section, section III.B *supra*, the scienter requirements do not restrict the statute's reach to doctors who purposely set out to perform the intact form of the D&E procedure. They therefore do not remedy the Act's failure to provide fair warning of the prohibited conduct; rather, they permit the Act's arbitrary and discriminatory enforcement. In short, as we recently held, a scienter requirement applied to an element that is itself vague does not cure the provision's overall vagueness. *See Wasden*, 376 F.3d at 933; *see also Farmer*, 220 F.3d at 138 ("At a minimum, to limit the scope of a statute to 'deliberately and intentionally' performing a certain procedure, the procedure itself must be identified or readily susceptible of identification. Here, it is not." (citations omitted)); *Planned Parenthood of Greater Iowa, Inc. v. Miller*, 195 F.3d 386, 389 (8th Cir. 1999) (holding that Iowa partial-birth abortion ban's inclusion of scienter requirement "cannot save it" because the Act still "encompasses more than just the [intact D&E] procedure"); *R.I. Med. Soc'y v. Whitehouse*, 66 F. Supp. 2d 288, 311-12 (D.R.I. 1999) (holding that scienter requirement could not save Rhode Island's partial birth abortion statute because the "scienter requirement modifies a vague term"). The scienter requirements, therefore, do nothing to cure the Act's vagueness.

**[15]** Because neither the statute when read as a whole nor its individual components provide fair warning of the prohibited conduct to those it regulates and because the Act permits arbitrary and discriminatory enforcement, we affirm the district court's determination that the Act is unconstitutionally vague.

## IV.   Remedy

In considering the remedy for a statute found to restrict access to abortion in violation of the Constitution, we are guided by "[t]hree interrelated principles." *Ayotte*, slip op. at 7. First, we endeavor to invalidate no more of a statute than necessary. *Id.* Second, "mindful that our constitutional mandate and institutional competence are limited, we restrain ourselves from 'rewrit[ing] state law to conform it to constitutional requirements' even as we strive to salvage it." *Id.* (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988)). Third, in devising the remedy we must be cognizant of legislative intent "for a court cannot 'use its remedial powers to circumvent the intent of the legislature.' " *Ayotte*, slip op. at 8 (quoting *Califano v. Westcott*, 443 U.S. 76, 94 (1979) (Powell, J., concurring in part and dissenting in part)). Applying these principles to the present case, we conclude that upholding the permanent injunction against the enforcement of the statute in its entirety is the only permissible remedy. We cannot, consistent with the judiciary's limited role, devise a narrower injunction that adequately addresses the various constitutional infirmities in the Act.

Our conclusion is dictated in part by the grounds on which we hold the Act unconstitutional. We do not conclude that it is unconstitutional solely due to its lack of a health exception. *Cf. Ayotte*, slip op. at 4 ("We granted certiorari to decide whether the courts below erred in invalidating the Act in its entirety because it lacks an exception for the preservation of pregnant minors' health." (internal citation omitted)). Had our holding on the statute's constitutionality rested solely on that ground, we might have been able to draft a more "finely drawn" injunction, *Ayotte*, slip op. at 9, prohibiting the Act's enforcement only when the banned procedure was necessary to preserve a woman's health. Because such relief would not require us to rewrite substantial portions of the statute, drafting the injunction would be within our institutional competence. Nonetheless, in the case of the Partial-Birth Abortion

Ban Act, the issuance of such an order would not be consistent with the *Ayotte* precepts, because in order to do so we would be required to violate the intent of the legislature and usurp the policy-making authority of Congress.

[16] Congress did not inadvertently omit a health exception from the Act. It was not only fully aware of *Stenberg*'s holding that a statute regulating "partial-birth abortion" requires a health exception, but it adopted the Act in a deliberate effort to persuade the Court to reverse that part of its decision.[26] Congress was advised repeatedly that if it passed an abortion ban without a health exception, the statute would be declared unconstitutional,[27] yet it rejected a number of amendments

---

[26]Senator Santorum, the lead sponsor of the Act in the Senate, stated during the floor debate, "We are here because the Supreme Court defended the indefensible [in *Stenberg*]. . . . We have responded to the Supreme Court. I hope the Justices read this Record because I am talking to you. . . . [T]here is no reason for a health exception" 149 Cong. Rec. S3486 (daily ed. Mar. 11, 2003) (statement of Sen. Santorum); *see also* 149 Cong. Rec. H4933 (daily ed. June 4, 2003) (statement of Rep. Conyers) ("[The Act] does not add a health exception but instead simply states that the procedures covered by the bill are not necessary and that their probation poses no risk to the mother's health. This declaration goes directly against the ruling of the Supreme Court in *Stenberg* . . . . The 'findings,' in effect, are an attempt to overturn *Stenberg*.").

[27]Numerous members of Congress stated during the debate on the Act that the statute was unconstitutional because it did not include a health exception. Senator Feinstein, for instance, said, "What is wrong with [the Act]? . . . To begin with, it is unconstitutional because it lacks a health exception. . . . A review of the Supreme Court's abortion decisions and the record makes clear that any ban on . . . what supporters of the Santorum bill incorrectly call partial-birth abortion — must include a health exception." 149 Cong. Rec. S3601 (daily ed. Mar. 12, 2003) (statement of Sen. Feinstein). Arguing in favor an amendment he proposed, Senator Durbin stated one reason to support it was "because it has a health exception not contained in [the Act], it is more likely to withstand the constitutional challenge and scrutiny across the street at the Supreme Court." 149 Cong. Rec. S3481 (daily ed. Mar. 11, 2003) (statement of Sen. Durbin). *See also, e.g.*, 149 Cong. Rec. S3424 (daily ed. Mar. 11, 2003) (statement of Sen. Murray) ("[T]he Supreme Court found the State law unconstitutional [in

that would have added such an exception.[28] It considered the

---

*Stenberg*] because it did not contain an exception to protect the woman's health. . . . Guess what. The [Act] fails the same constitutional test."); 149 Cong. Rec. S3576 (daily ed. Mar. 12, 2003) (statement of Sen. Mikulski) ("We are not loophole shopping when we insist that an exception be made in the case of serious and debilitating threats to a woman's physical health. This is what the Constitution requires . . . ."); 149 Cong. Rec. S3561 (daily ed. Mar. 12, 2003) (statement of Sen. Boxer) ("We have a bill that, if it passes, makes no exception for the health of the mother. We have a bill that legal experts say is legally identical to the law that was ruled unconstitutional by the Supreme Court."); 149 Cong. Rec. H4926 (daily ed. June 4, 2003) (statement of Rep. Nadler) ("The bill lacks an exception for the health of the woman. I know that some of my colleagues do not like the constitutional rule that has been in place and reaffirmed by the Court for 30 years; but that is the supreme law of the land, and no amount of rhetoric, even if written into legislation, will change that."); 149 Cong. Rec. H4924 (daily ed. June 4, 2003) (statement of Rep. Green) ("[In *Stenberg*,] the Court ruled that any ban on methods of abortion must provide an exception for women's health, and also struck down the Nebraska law for failing to include such an exception. [The Act] continues to flout the Supreme Court's rulings . . . ."); 149 Cong. Rec. S3611 (daily ed. Mar. 12, 2003) (statement of Sen. Jeffords); 149 Cong. Rec. S3604 (daily ed. Mar. 12, 2003) (statement of Sen. Lautenberg); 149 Cong. Rec. S3584 (daily ed. Mar. 12, 2003) (statement of Sen. Kennedy); 149 Cong. Rec. S3599 (daily ed. Mar. 12, 2003) (statement of Sen. Cantwell); 149 Cong. Rec. H4933 (daily ed. June 4, 2003) (statement of Rep. Farr); 149 Cong. Rec. H4932 (daily ed. June 4, 2003) (statement of Rep. Filner); 149 Cong. Rec. H4927 (daily ed. June 4, 2003) (statement of Rep. Larson); 149 Cong. Rec. H4927 (daily ed. June 4, 2003) (statement of Rep. Lowey).

[28]The House Judiciary Committee rejected an amendment that would have added a health exception to the Act. H.R. Rep. No. 108-58, at 71-73. In addition, the House itself rejected an amendment that would have revised the ban by adding a health exception, among other changes. *See* 149 Cong. Rec. H4948 (daily ed. June 4, 2003) (rejecting House Amendment 154). The House also rejected a motion to recommit the Act to the House Judiciary Committee with instructions to add a health exception. *See* 149 Cong. Rec. H4949 (daily ed. June 4, 2003) (rejecting motion). The Senate rejected two amendments that would have revised the ban by adding a health exception, among other changes. *See* 149 Cong. Rec. S3611 (daily ed. Mar. 12, 2003) (rejecting Senate Amendment 261); 149 Cong. Rec. S3579 (daily ed. Mar. 12, 2003) (rejecting Senate Amendment 259). The Senate also rejected a motion to commit the Act to the Judiciary Committee with instructions to consider the constitutional issues raised in *Stenberg*, including those relating to a health exception. *See* 149 Cong. Rec. S3580 (daily ed. Mar. 12, 2003) (rejecting the motion).

omission of the exception to be a critical component of the legislation it was enacting. Both of the Act's main sponsors, as well as various co-sponsors, asserted that the purpose of the Act would be wholly undermined if it contained a health exception and that, if an exception were included, the statute would be of little force or effect.[29] Enacting a "partial-birth abortion" ban *with no health exception* was clearly one of Congress's primary motivations in passing the Act.

In light of this legislative history, it would be improper for us to issue an injunction that essentially adds a health excep-

---

[29]In urging the House Judiciary Committee to defeat a proposed amendment that would have added a health exception to the Act, Representative Chabot, the sponsor of the Act in the House, stated, "a health exception, no matter how narrowly drafted, gives the abortionist unfettered discretion in determining when a partial-birth abortion may be performed. And abortionists have demonstrated that they can justify any abortion on this ground . . . . It is unlikely then that a law that includes such an exception as being proposed would ban a single partial-birth abortion or any other late-term abortion." H.R. Rep. No. 108-58, at 69 (statement of Rep. Chabot). Similarly, in arguing against a health exception amendment on the Senate floor, Senator Santorum, the Act's main sponsor in the Senate, asserted, "In practice, of course, health means anything, so there is no restriction at all." 149 Cong. Rec. S3607 (daily ed. Mar. 12, 2003) (statement of Sen. Santorum). Senator Santorum later argued that "health" is a "term — in fact, the courts have interpreted it to mean anything" and that a health exception "frankly, swallows up any limitation, restriction on abortion." 149 Cong. Rec. S3590 (daily ed. Mar. 12, 2003) (statement of Sen. Santorum). A co-sponsor of the Act, Senator DeWine, argued that because of the way "health of the mother" has been defined by the Supreme Court, an exception to protect it would mean "almost any excuse would be enough to justify a late-term partial-birth abortion. Yet the abortionist would be within the law because he determined the health of the mother was at risk." 149 Cong. Rec. S3605 (daily ed. Mar. 12, 2003) (statement of Sen. DeWine). Representative Sensenbrenner, a co-sponsor of the Act, made similar comments in arguing against a health exception amendment. He stated, "Abortionists have demonstrated that they can and will justify any abortion on the grounds that it, in the judgment of the attending physician, is necessary to avert serious adverse health consequences to the woman." 149 Cong. Rec. H4940 (daily ed. June 4, 2003) (statement of Rep. Sensenbrenner).

tion to the statute — an exception that Congress purposefully excluded from the Act. When Congress deliberately makes a decision to omit a particular provision from a statute — a decision that it is aware may well result in the statute's wholesale invalidation — and when it defeats multiple amendments that would have added that provision to the statute, we would not be faithful to its legislative intent were we to devise a remedy that in effect inserts the provision into the statute contrary to its wishes. Such an action would be inconsistent with our proper judicial role.

Our inquiry as to whether the legislature would have "preferred what is left of its statute to no statute at all," *Ayotte*, slip op. at 8, does not change our conclusion. Given the record before us, it is impossible to say that Congress would have preferred the Act with a health exception engrafted upon it to no statute at all. The creation of legislation is a fundamental part of the political process, to be performed by the elected branches only. In deciding whether to adopt legislation on highly controversial issues, elected officials must weigh various factors and make informed political judgments. When, in such cases, it is not possible to achieve the full legislative goal, the leaders of the battle may prefer to drop the legislation entirely in order to be able to wage a more dramatic and emotional campaign in the public arena. They may conclude that leaving an issue completely unaddressed will make it easier for them to achieve their ultimate goals than would a partial resolution that leaves their "base" discontented and disillusioned. Dropping the proposed legislation (or even having it defeated) may be the best way to gain adherents to the cause, inspire the faithful, raise funds, and possibly even generate support for a constitutional amendment. Conversely, the sponsors of a bill may consider a partial victory worthless from a political standpoint, as the sponsors of the Partial-Birth Abortion Ban Act told their fellow members of Congress here, or they may just object strongly to such a solution from a moral or even a religious standpoint. Particularly when an issue involving moral or religious values is at stake, it is far

from true that the legislative body would always prefer some of a statute to none at all.

Abortion is an issue that causes partisans on both sides to invoke strongly held fundamental principles and beliefs. We are prepared to deal with the constitutional issues relating to that subject, but not with the question how either side would exercise its moral and other judgments with respect to tactical political decisions. Whether the congressional partisans who supported the Act would have preferred to have what they repeatedly and unequivocally deemed to be ineffective legislation or to do without the statute and preserve the status quo ante as a political and moral tool is a determination we are simply unable and unwilling to make.

[17] In any event, we need not rest our decision as to the appropriate remedy solely on the omission of a health exception because we have determined that the Act is unconstitutional on other grounds as well — on the grounds that it imposes an undue burden on women seeking abortions and that it is impermissibly vague. Along with the omission of the health exception, the nature of these constitutional errors precludes us from devising a remedy any narrower than the invalidation of the entire statute, for a number of reasons. First, in order to cure the constitutional infirmities, we would in effect have to strike the principal substantive provision that is now in the Act and then, akin to writing legislation, adopt new terms with new definitions and new language creating limitations on the Act's scope. Second, creating relief that would limit the Act sufficiently to enable it to pass constitutional muster would require us to make decisions that are the prerogative of elected officials and thus would be inconsistent with the proper distribution of responsibilities between the legislative and judicial branches. Third, the magnitude of the change in the Act's coverage that would be necessary to make the Act even potentially constitutional would result in a statute that would be fundamentally different from the one

enacted. Fourth, devising narrowing relief of this type would be unfaithful to Congress's intent in passing the Act.

Our conclusions regarding the undue burden imposed by the Act and the Act's impermissible vagueness were based on our determination that the Act's definition of "partial-birth abortion" covers both forms of the D&E procedure; at the very least, we said, the statute does not adequately distinguish between those forms. Significantly, the two forms of D&E constitute the means by which the vast majority of post-first trimester previability abortions are conducted. Remedying the problem of the Act's scope is not a simple matter of striking a portion of the statutory language, however, or of drafting an injunction that performs that function. Nor is the existing statutory language susceptible to a simple limiting construction. In order to remedy the constitutional problems with the Act's definition of "partial-birth abortion," we would essentially have to "rewrite [the statutory language] to conform it to constitutional requirements," a task the Court has cautioned we should not undertake. *Ayotte*, slip op. at 7 (quoting *Am. Booksellers Ass'n*, 484 U.S. at 397).

Furthermore, before we could even begin the task of rewriting the statute so as to arrive at an adequate injunctive order, we would first have to decide which of the different methods of performing post-first trimester previability abortions should be prohibited by the revised Act.[30] We are not willing to make such choices for four reasons. First, doctors disagree about the medical necessity and effects of each of the methods. The decision regarding which of these methods to regulate is a *policy* choice that only Congress can make.[31] Second, choos-

---

[30]Induction is the method used to perform most post-first trimester previability abortions not done by D&Es. Because of the Act's failure to differentiate between intact and non-intact D&E, which we held sufficient to create an undue burden, we did not reach the issue whether the Act's definition of the prohibited procedures also encompasses induction, although it might well do so.

[31]*See Denver Union Stock Yard Co. v. Producers Livestock Mktg. Ass'n*, 356 U.S. 282, 289 (1958) ("[Courts] should guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy" (internal quotation marks and citations omitted)).

ing which methods to regulate would require us to draw lines between different abortion procedures with which we are not "intimately familiar," another factor cautioning against our attempting to create a narrow remedy.[32] Third, determining whether to cover particular forms or procedures would raise unresolved constitutional questions that we need not otherwise decide on this appeal.[33] For example, neither this court nor the Supreme Court has previously decided whether a statute that bans only intact D&E would be constitutional. *See* note 18 *supra*. Fourth, even if Congress would have preferred an injunction that made the controversial policy choices we would be required to make and even if Congress would have preferred the substantial alteration of the statute to its total invalidation, it is contrary to the appropriate allocation of legislative *and* judicial functions for Congress to have "covered the waterfront" and left the job of selecting the conduct that could properly be prohibited to us. As *Ayotte* reiterated, Congress may not " 'set a net large enough to catch all possible offenders, and leave it to the courts to step inside' to announce to whom the statute may be applied." Slip op. at 8 (quoting *United States v. Reese*, 92 U.S. 214, 221 (1876)). Here, Congress, notwithstanding existing Supreme Court law and the multiple opportunities it was given to limit the Act's scope, passed an overly broad ban that it was aware likely violated the Constitution as construed by the Court. In so doing, Congress left it to the judiciary to sort out which parts

---

[32]*See United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 479 n.26 (1995) (refusing to "rewrite the statute" because, *inter alia*, "[d]rawing a line between a building and sidewalks with which we are intimately familiar . . . is a relatively simple matter. In contrast, drawing one or more lines between categories of speech covered by an overly broad statute . . . involves a far more serious invasion of the legislative domain.").

[33]*See id.* at 479 (rejecting a narrower remedy than complete invalidation of a statute because, *inter alia*, creating it would require the court to choose among policy alternatives that "would likely raise independent constitutional concerns whose adjudication is unnecessary to decide this case").

of the statute are constitutional and which are not. This is precisely what *Ayotte* reminded us Congress may not do. Narrowing the statute is "quintessentially legislative work" that, if undertaken by us, would exceed "our constitutional mandate and institutional competence." *Ayotte*, slip op. at 7.[34]

Even if we could, consistent with the judiciary's proper role, choose which procedures to prohibit, the only options that stand a chance of passing constitutional muster would leave us with an Act of a drastically more limited scope than the current one. Because the Supreme Court has held that a statutory prohibition that covers both intact and non-intact D&Es is unconstitutional, *Stenberg*, 530 U.S. at 938-46, the only possibly constitutional regulation would be a prohibition limited to the intact D&E procedure (and possibly induction). Even assuming that such a regulation would be constitutional (*but see supra* note 18), an injunction that so limited the statute would outlaw only a very small portion of the procedures prohibited under the existing Act. Such an injunction would radically change the nature of the statute and result in a regulatory scheme substantially different from the one passed by Congress. When a "narrow" remedy would substantially change the very nature of a statute, adopting that remedy exceeds the proper judicial role.[35]

**[18]** Finally, we believe that devising a narrow remedy would not be "faithful to legislative intent." *Ayotte*, slip op. at 9. Congress did not unintentionally draft the broad definition of "partial-birth abortion" that gives rise to the undue burden

---

[34]A further indication that narrowing would not be faithful to legislative intent is the absence from the Act of a severability clause. *Ayotte* pointed to the presence of such a clause as an indication that a narrower remedy is consistent with legislative intent. Slip. op at 9-10.

[35]*See Sloan v. Lemon*, 413 U.S. 825, 834 (1973) (striking down entire Pennsylvania tuition reimbursement statute because to eliminate only unconstitutional applications "would be to create a program quite different from the one the legislature actually adopted"), *cited in United States v. Booker*, 125 S. Ct. 738, 758 (2005).

and vagueness concerns, nor did it write the unconstitution-
ally overbroad language without the benefit of judicial guid-
ance. Instead, Congress chose not to follow the roadmap the
Court provided in *Stenberg*. It repeatedly dismissed warnings
that the Act's overly inclusive scope made it vulnerable to
constitutional challenge.[36] Even if we could draft a remedy

---

[36]As in the case of the health exception, Congress rejected repeated
warnings of unconstitutionality, this time that the Act's language was too
broad. It ignored admonitions to follow the Court's roadmap by defining
the prohibited procedure using the medical terms for intact D&E. Senator
Feinstein, for example, stated, the Act "attempts to ban a specific medical
procedure which it calls partial-birth abortion. But the bill offers no medi-
cal definition of partial-birth abortion." She then questioned the Act's
sponsors' refusal to use such a definition. She asked, "Why wouldn't the
proponents of this bill put in a medically acceptable definition so that
those physicians who were practicing medicine and may encounter this
kind of case would know precisely what is prohibited? I believe I know
the answer. The answer is that the bill is calculated to cover more than just
one procedure. . . . I believe if the bill becomes law, it would be struck
down as unconstitutional.") 149 CONG. REC. S3601 (daily ed. Mar. 12,
2003) (statement of Sen. Feinstein); *see also* 149 CONG. REC. S3600 (daily
ed. Mar. 12, 2003) (statement of Sen. Feinstein) ("[The Act] is not what
it purports to be. It supposedly bans one procedure, D&X, but actually
confuses this procedure with another, D&E, the most commonly used
abortion procedure. In fact, its wording is so vague that it could be con-
strued to criminalize all abortions."). Other members of Congress also
asserted that the Act's definition of the banned procedure was overly
broad and ignored the Court's guidance in *Stenberg*. Representative Farr
explained, "The definition of the banned procedure in [the Act] is vague
and could be interpreted to prohibit some of the safest and most common
abortion procedures that are used before viability during the 2nd trimester.
This legislation could have been written using precise, medical terms
. . . .") 149 CONG. REC. H4933 (daily ed. June 4, 2003) (statement of Rep.
Farr). Similarly, Senator Boxer stated, "What we have is the *Stenberg* case
that ruled that the Nebraska statute was unconstitutional because it placed
an undue burden on women because the definition is vague and there is
no exception to protect women's health. Lawyers and constitutional
experts tell us that the same problem exists in [the Act]." 149 CONG. REC.
S3561 (daily ed. Mar. 12, 2003) (statement of Sen. Boxer). Representative
Conyers stated, "It is unclear what types of procedures are covered by the
legislation. Although some believe the legislation would apply to an abor-
tion technique known as 'Dilation and Extraction' (D & X), or 'Intact
Dilation and Evacuation,' it is not clear the term would be limited to a par-

that sufficiently restricted the scope of the statute (which we believe we could not properly do consistent with our limited judicial role), such a narrowing construction would serve not to cure an error but to reverse a political judgment that Congress expressly made. Nor can we say that Congress would have preferred any such narrowing construction to no statute at all. For reasons discussed above, we are not capable of making the judgment that, in the eyes of Congress, legislation restricted to non-intact D&Es would have been preferable to no legislation at all. We believe that a narrow remedy designed to address the undue burden and vagueness concerns, as well as the health exception, would likely violate Congress's intent in passing the Act.

**[19]** We are reluctant to invalidate an entire statute. However, after considering all of the obstacles to our devising a narrower remedy, we conclude that such is our obligation.

---

ticular and identifiable practice. . . . [The Act] could well apply to additional abortion procedures known as D & E (Dilation and Evacuation), and induction." 149 Cong. Rec. H4934 (daily ed. June 4, 2003) (statement of Rep. Conyers). *See also, e.g.*, 149 Cong. Rec. S3424 (daily ed. Mar. 11, 2003) (statement of Sen. Murray) ("[T]he language is so broad that it bans other constitutionally protected procedures. The Supreme Court's rulings state: 'Even if the statute's basic aim is to ban D&X, its language makes clear it also covers a much broader category of procedures.' The bill before us is similarly unconstitutional because it covers too many constitutionally protected procedures."); 149 Cong. Rec. S3611-12 (daily ed. Mar. 12, 2003) (statement of Sen. Feingold) ("Congress should seek to regulate abortions only within the constitutional parameters set forth by the U.S. Supreme Court. Yet in light of the Supreme Court's 2000 decision [in *Stenberg*], the bill before us today . . . is unconstitutional on its face. It is so vague and overbroad that it, too, could unduly burden a woman's right to choose prior to viability."); 149 Cong. Rec. S3576 (daily ed. Mar. 12, 2003) (statement of Sen. Mikulski) ("[The Act] does not clearly define the procedure it claims to prohibit. Let me be clear about this. The [Act] is unconstitutional."); 149 Cong. Rec. S3481 (daily ed. Mar. 11, 2003) (statement of Sen. Durbin); 149 Cong. Rec. H4934 (daily ed. June 4, 2003) (statement of Rep. Stark); 149 Cong. Rec. H4937 (daily ed. June 4, 2003) (statement of Rep. Jackson Lee).

Accordingly, we uphold the district court's order permanently enjoining enforcement of the Act in its entirety.

## V.   Conclusion

The Act lacks the health exception required of all abortion regulations in the absence of a medical consensus that the prohibited procedure is never necessary to preserve women's health, imposes an undue burden on a woman's right to choose a previability abortion, and is impermissibly vague. For each of these reasons, independently, we hold that the Act is unconstitutional. We also hold that, in light of all the circumstances, the appropriate remedy for the serious constitutional flaws in the Act is that which the district court elected: to enjoin the enforcement of the statute in its entirety. The judgment of the district court is **AFFIRMED**.